```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
UNITED STATES OF AMERICA,                :
                                         :
                                         :
                                         :         23 Crim. 566 (LGS)
              -against-                  :
                                         :         OPINION AND ORDER
DANNON CRAWFORD,                         :
                            Defendant.   :
                                         :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

Defendant Dannon Crawford was charged in an Information filed November 1, 2023, with one count of possession of ammunition after a felony conviction in violation of 18 U.S.C. § 922(g)(1) and (2). Defendant moved to dismiss the Information, contending that § 922(g)(1) is unconstitutional. For the reasons discussed below, the motion is denied.

I.  **BACKGROUND**

The following facts are taken from the allegations made in submissions by the Government. Although Defendant has not pleaded guilty, he does not dispute any facts about the offense conduct.

Prior to the current offense, Defendant pleaded guilty to a felony, Robbery in the Second Degree, on September 19, 2007. *See* N.Y. Penal L. § 160.10. On or about January 7, 2023, a person was captured on video surveillance footage discharging a firearm several times at a vehicle. Law enforcement officers later recovered five shell casings in the vicinity of where the firearm had been discharged. Law enforcement officers identified Defendant as the shooter in the video.

The criminal complaint, filed July 14, 2023, alleges that "[D]efendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed ammunition . . . [that] was in and affecting commerce" in violation of 18 U.S.C. § 922(g)(1). Defendant was arrested on July 27, 2023. Defendant waived indictment on November 1, 2023; an Information was filed the same day. On January 29, 2024, Defendant moved to dismiss the Information, arguing that § 922(g)(1) violates the Second Amendment of the Constitution.

## II. LEGAL STANDARD

The Second Amendment recognizes "an individual right to keep and bear arms for self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).[1] "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. When analyzing statutes that implicate the Second Amendment right, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The framework for assessing whether a regulation is "consistent with the Nation's historical tradition of firearm regulation" differs according to the nature of the problem the regulation is meant to solve. *Id.* at 26-29. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26.

"When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* at 28. "[A]nalogical

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. In other words, "a modern-day regulation" need not be "a dead ringer for historical precursors" to survive constitutional scrutiny. *Id.* Instead, the regulations must be "relevantly similar" in light of "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.

### III.   DISCUSSION

Defendant makes both facial and as-applied challenges to 18 U.S.C. § 922(g)(1). Both challenges fail because § 922(g)(1) is constitutional on its face and as applied to Defendant.

**A. Facial Challenge**

Defendant argues that § 922(g)(1) is facially unconstitutional under the historical analysis required by *Bruen* because the United States does not have a historical tradition of categorically and permanently disarming felons. Defendant's facial challenge fails because § 922(g)(1) is constitutional under binding Second Circuit precedent. The Government also satisfies the historical test established in *Bruen* by demonstrating that § 922(g)(1) aligns with the nation's historical tradition of firearm regulation.

1.   **Second Circuit Precedent Compels Denial of Defendant's Motion.**

The motion to dismiss is denied based on binding Second Circuit precedent that § 922(g)(1) is constitutional under the Second Amendment. *See United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam). As explained below, *Bogle* remains good law and is therefore binding here.

The Second Circuit's holding in *Bogle* is based on the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S.

3

742 (2010). *See Bogle*, 717 F.3d at 281-82. In *Heller*, the Supreme Court recognized that "the Second Amendment confer[s] an individual right to keep and bear arms," 554 U.S. at 595, but stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626. In *McDonald* the Supreme Court reaffirmed: "[w]e made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons." 561 U.S. at 786. Relying on these statements in *Heller* and *McDonald*, the Second Circuit in *Bogle* held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." 717 F.3d at 281-82.

Defendant argues that *Bogle* is no longer good law because it conflicts with the holding in *Bruen*. This is incorrect. The Supreme Court stated in *Bruen* that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of . . . [certain] licensing regimes . . . which often require applicants to undergo a background check" and "are designed to ensure . . . that those bearing arms in the jurisdiction are, in fact, *law-abiding*, responsible citizens." 597 U.S. at 38 n.9 (emphasis added); *see also id.* at 72 (Alito, J., concurring) (stating that the holding in *Bruen* does not "disturb[] anything that [the Court] said in *Heller* or *McDonald*," and confirming that "[o]ur holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun"); *id.* at 81 (Kavanaugh, J., concurring) ("Nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."). Because *Bruen* does not find that policies that restrict gun ownership to "law-abiding, responsible citizens" are unconstitutional, it does not disturb the dicta in *Heller* and *McDonald* that form the basis for *Bogle*'s holding. *See Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 100 (2d Cir. 2023) ("Even if Supreme Court dicta do not constitute

4

established law, we nonetheless accord deference to such dicta where, as here, no change has occurred in the legal landscape.").

Defendant also argues that *Bogle* is no longer good law after the Second Circuit's decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023). This argument is unpersuasive. *Antonyuk* -- like *Bogle* -- is consistent with the reasoning of *Bruen*. *Antonyuk* reaffirms that "the Supreme Court has repeatedly admonished that the Second Amendment protects the rights of law-abiding and responsible citizens," *Antonyuk*, 89 F.4th at 314 (citing *Heller*, 554 U.S. at 635, and *Bruen*, 597 U.S. at 8-9), and that there is "widespread consensus . . . that restrictions which prevent dangerous individuals from wielding lethal weapons are part of the nation's tradition of firearm regulation." *Id*. at 312. As discussed above, *Bogle* is based on the same reasoning and is therefore reinforced by *Antonyuk*.

Defendant relies on the statement in *Antonyuk* that *Bruen* "abrogate[ed]" the "general approach" the Second Circuit took to Second Amendment claims. 89 F.4th at 298. That statement merely clarifies that the means-end framework previously employed by the Second Circuit is no longer valid. *Bogle* did not apply that means-ends framework and therefore remains undisturbed. Defendant's reliance on the Second Circuit's non-precedential decision in *Taveras v. N.Y.C.*, No. 21-398-CV, 2022 WL 2678719 (2d Cir. July 12, 2022) (summary order), is misplaced for the same reason. *Taveras* similarly recognized the invalidity of the means-end framework, which *Bogle* did not apply. *See id*. at *1 (referring to the means-end framework and stating that the "Supreme Court expressly rejected the two-part test that this Circuit -- and many others -- had been applying to Second Amendment claims").

> 2. **Section 922(g)(1) is Consistent with the Nation's Historical Tradition of Firearms Regulation.**

Independent of the binding authority of *Bogle*, the Government has met the burden

imposed by *Bruen*. Defendant is part of "the people" to whom the Second Amendment applies. *See Heller*, 554 U.S. at 580-81 (interpreting "the people" referenced in the Second Amendment to mean "all Americans"). Section 922(g)(1) is nonetheless constitutional because *Bruen* permits restrictions on Second Amendment rights as long as they are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The Government provides two lines of historical evidence that are sufficiently analogous to show that § 922(g)(1) is consistent with the nation's historical traditions.

First, § 922(g)(1) is analogous to historical regulations that categorically disqualified groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law. The Supreme Court has emphasized the historical significance of "the predecessor to our Second Amendment" in the 1689 English Bill of Rights, to which *Heller* looked in holding that the Second Amendment recognizes an individual right to bear arms. *See Heller*, 554 U.S. at 593. The 1689 English Bill of Rights states, "Protestants . . . may have Arms for their Defence suitable to their Conditions, *and as allowed by Law*." *Bruen*, 597 U.S. at 44 (quoting 1 Wm. & Mary c. 2, § 7, in 3 Eng. Stat. at Large 417 (1689)) (emphasis added). Around the same time, the English government had passed a law prohibiting the possession of weapons and ammunition by any Catholic who refused to make a declaration renouncing his or her faith. 1 Wm. & Mary c. 15, in 6 Stats. of the Realm 71-73 (1688).

The English practice of legislating status-based disarmament, tied to a group's perceived dangerousness, continued in colonial America. *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006) ("Laws disarming

6

groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common.");[2] Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 L. & Hist. Rev. 567, 576 (1998) ("[L]egislatures followed the English example in denying the right to own guns to potentially dangerous groups: [B]lacks, slave and free; Indians; propertyless whites; non-Protestants or potentially unruly Protestants."). As in seventeenth-century England, colonial Catholics were subject to disarmament in at least Maryland, Virginia and Pennsylvania. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

Second, § 922(g)(1) is analogous to punishments historically imposed on felons. In England before the Founding, a felony conviction would result in the total forfeiture of the defendant's estate -- including his arms. *See* 4 William Blackstone, Commentaries *379-82. Under the English common law, a convicted felon was "civilly dead," which resulted in "forfeiture . . . and an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888) (discussing the application of New York's civil death statute); *see also id.* at 156 (Earl, J., dissenting) (noting that civil death also extinguished the right "to bear arms"). This doctrine was codified in many states as early as the 18th century. *See* Note, *Civil Death Statutes -- Medieval Fiction in a Modern World*, 50 Harv. L. Rev. 968, 968-69 nn.1, 4 (1937) (collecting statutes). Many states also subjected certain felons to estate forfeiture. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn.275-276 (2014) (collecting statutes). Around the time of the Founding, the punishment for most felonies, both in England and America, was death. *See* 4 William Blackstone, Commentaries *98 ("The idea of

---

[2] Viewing those groups as dangerous or untrustworthy is odious and contrary to American law and societal values today. The Court is nevertheless required to apply the *Bruen* framework, which requires assessing whether historical firearms regulations are "relevantly similar" to those today. 597 U.S. at 29.

felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them."); *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J. concurring in the judgment) (noting the "ubiquity of the death penalty in the founding era" for serious crimes). Capital punishment implies a deprivation of all rights, including the right to bear arms.

Both sets of historical regulations -- regarding status-based disarmaments and felony punishments -- are sufficiently analogous to § 922(g)(1). Historical regulations must be analogous in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. As to disarmament of a group, the "how" is identical -- certain categories of people are disqualified from possessing firearms. The "why" is a sufficiently close analogy; the disqualified groups were deemed too untrustworthy or dangerous to possess firearms. *See United States v. White*, No. 23 Crim. 140, 2023 WL 6066201, at *5 (S.D.N.Y. Sept. 18, 2023) ("[T]here was a robust tradition of legislatures disarming categories of individuals it deemed a threat to ordered society. . . ."). The second set of historical regulations -- punishments for felons -- also satisfies the "how" and the "why." The specific punishments, from forfeiture to death, functioned by identifying felons for disarmament based on their criminal conduct in order to disable them from future transgressions against the social order. *See United States v. Davila*, No. 23 Crim. 292, 2023 WL 5361799, at *4 (S.D.N.Y. Aug. 22, 2023) ("That the founders understood felons to be punishable by death and estate forfeiture leaves little doubt that they also understood that felons could be permissibly disarmed."). Section 922(g)(1) similarly disarms individuals with a history of harming society, presumably because they may pose a renewed threat upon release.

Defendant argues that reasoning by analogy is inappropriate here because crime existed at the time of the Founding and the absence of a historical regulation barring felons from

possessing firearms is evidence that § 922(g)(1) is inconsistent with the Second Amendment. This argument misstates the Government's burden. As described above, *Bruen* permits regulations "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The Supreme Court recognized in *Bruen* that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" and that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders . . . ." *Id.* at 27. Section 922(g)(1) implicates "unprecedented societal concerns [and] dramatic technological changes," such as "the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel," that would have been inconceivable at the Founding. *Davila*, 2023 WL 5361799, at *5. Defendant's insistence on a "historical twin," rather than a "representative historical analogue," demands more than *Bruen* requires.

> B.  **As-Applied Challenge**

Defendant argues that § 922(g)(1) is unconstitutional as applied to him because there is no historical precedent for a permanent, categorical ban on firearm possession for a convicted felon like him. Defendant's as-applied challenge fails. Defendant provides no binding precedent to show that § 922(g)(1) is amenable to as-applied challenges. Even if Defendant's as-applied challenge is proper, § 922(g)(1) is constitutional as applied to Defendant due to his conviction for a violent felony.

"[T]here is no precedent requiring [courts in the Second Circuit] to conduct an individualized inquiry by felony" for challenges to § 922(g)(1). *United States v. Mingues*, 23 Crim. 81, 2023 WL 9604697, at *6 (N.D.N.Y. Dec. 23, 2023); *see also United States v. Nelson*, No. 22 Crim. 436, 2023 WL 6520378, at *3 (S.D.N.Y. Oct. 4, 2023) ("[T]here is nothing in *Heller*, *McDonald*, or *Bogle* to suggest that the validity of a restriction on a felon possessing a

9

firearm turns on the severity of the felony that triggers the restriction."). The Second Circuit has not yet considered whether as-applied challenges may be appropriate. Both the Eighth and Tenth Circuits have concluded that there is no basis to draw distinctions under § 922(g)(1) based on the underlying felony conviction. *See Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) ("In preserving 'shall-issue' regimes and related background checks [in *Bruen*], the Court arguably implied that it was constitutional to deny firearm licenses to individuals with felony convictions."); *United States v. Jackson*, 69 F.4th 495, 505-06 (8th Cir. 2023) (rejecting as-applied challenge to 922(g)(1) after reviewing the history and tradition of firearms regulation and considering "the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons"). The uniform historical treatment of felons also supports uniform treatment without reliance on the felon's underlying offense. *See Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) ("[D]eath was the standard penalty for all serious crimes at the time of the founding").

Even if Defendant's as-applied challenge is proper, the challenge fails. For an as-applied challenge, a court must analyze "the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006). Defendant was convicted of second-degree robbery, which under New York law requires a finding that the defendant "forcibly [stole] property." N.Y. Penal L. § 160.10; *see also United States v. Pereira-Gomez*, 903 F.3d 155, 165 (2d Cir. 2018) (In New York, robbery "requires using or threatening the immediate use of physical force upon another person. That level of physical force must be enough to prevent resistance to the taking or to compel the owner to deliver up the property."). Because Defendant was convicted of a violent felony, he is squarely

within the class of people whose Second Amendment rights may be restricted. *Cf. United States v. Sanders*, No. 23 Crim. 78, 2023 WL 8790309, at *4 n.6 (E.D.N.Y. Dec. 19, 2023) ("[N]umerous decisions within this Circuit [have rejected] the argument that 922(g)(1) is unconstitutional as applied to an individual . . . with a prior violent felony.").

Defendant relies heavily on *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc), to support his as-applied challenge. This reliance is misplaced. First, the decision by the Third Circuit Court of Appeals is not binding. Second, the Third Circuit is an "outlier" in permitting an as-applied challenge to § 922(g)(1). *See United States v. Sternquist*, No. 22 Crim. 473, 2023 WL 6066076, at *8 (E.D.N.Y. Sept. 15, 2023). No court in the Second Circuit has found *Range* persuasive. *See, e.g.*, *United States v. Whyte,* No. 21 Crim. 390, 2023 WL 8096926, at *14 (E.D.N.Y. Nov. 21, 2023) (collecting cases). Third, the holding in *Range* is a "narrow one" and does not apply here. *Range*, 69 F.4th at 106. The plaintiff in *Range* had been convicted of "making a false statement to obtain food stamps," a non-violent crime. *Id.* at 98. Although classified as a "misdemeanor," the plaintiff's conduct was punishable by up to five years imprisonment and thus fell within § 922(g)(1). *Id.* Applying *Bruen*, the Third Circuit concluded that the Government had failed to meet its burden of identifying relevant historical analogs to justify a lifetime ban on firearm ownership for a non-violent offender. *Id.* at 105. Since Defendant was convicted of a violent felony, *Range* is inapplicable to him. Defendant's as-applied challenge is rejected.

IV.   **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss the indictment is **DENIED**. The Clerk of the Court is respectfully directed to close the motion at Dkt. 25.

Dated: April 17, 2024
    New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

11